IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ADAM GRIEGO and
ELIJAH HAUKEREID

    Plaintiffs,

vs.                                                             Civ. No. 16-475 JCH-SCY

DAVID CHAVEZ,
Individually and in his official capacity
as a Forest Ranger,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court on the issue of damages to be awarded to Plaintiffs Adam Griego ("Griego") and Elijah Haukereid ("Haukereid"). On May 24, 2016, Plaintiffs asserted claims against both David Chavez ("Chavez"), an officer with the United States Forest Service, and the United States of America, for violation of their Constitutional rights arising from an encounter that occurred on May 26, 2014 on Forest Service land. *See* Complaint, Doc. 1. In March of 2017, Plaintiffs dismissed their claims against the United States, leaving only their claims against Chavez. *See* Docs. 34 and 35. Chavez has not appeared or otherwise answered this lawsuit in any way. As a result, the Court granted the Plaintiffs' motion for default judgment [Docs. 36 and 44] against Chavez and on May 20, 2017, entered judgment against him on both Plaintiffs' claims.

In the meantime, on December 8, 2015, the United States charged Chavez by information with assaulting Griego in violation of the constitution of the United States. *See United States v. David Chavez*, Cr. No. 15-4362 LF, Doc. 1. The information charging Chavez does not mention

Haukereid. Chavez pled guilty, and on June 1, 2016, the United States Magistrate Judge sentenced Chavez to one year probation with three months of home detention with location monitoring, and 200 hours of community service. *United States v. David Chavez, id.,*. at Doc. 12.

On January 22, 2018, the Court held a bench trial on the issue of damages to be awarded to Plaintiffs. Chavez did not appear at this trial. The Court heard the testimony of witnesses and admitted exhibits into evidence. *See* Doc. 69.

## **FINDINGS OF FACT**

The Court, having considered the evidence brought forth at the bench trial, makes the following findings of fact.

**A.  Chavez's Assault and Battery of Adam Griego**

1.  On May 24, 2016, there were eight people camping at the Juan Tomas campsite in the mountains east of Albuquerque. Ex. 14, Sonia Jaramillo Affidavit, ¶ 8. The campers were relaxing. Ex. 15, Michael Pangburn Affidavit, ¶ 6. Both Chavez and another United States Forest Service Officer, David Olson, arrived at the Juan Tomas campsite at about the same time. Elijah Haukereid ("Haukereid"), Tr. 15:13-25[1]; Ex. 3A and 3B (showing Officer Chavez holding Griego down on the hood of his Ranger vehicle and Officer Olson's vehicle).

2.  Griego was making a sandwich on the hood of his truck when Officer Chavez approached him and asked if he had driven the silver truck down the road. Griego, Tr. 67:11-68:3. Griego said yes, and Chavez used expletives and put Griego in handcuffs. Griego, Tr. 68:4-10. As Chavez admitted, Griego complied with Chavez's commands. Ex. 6, Plea

---

[1] References to the hearing transcript will include the last name of the witness and specific reference to the Transcript ("Tr.") along with the page and line numbers.

Agreement, p.3 ("I instructed A.G. to turn around and place his hands behind his back, and he complied with these instructions."); Griego, Tr. 68:9-10.

3. Officer Chavez slammed Griego's head into the hood of his Forest Service vehicle immediately after putting him into handcuffs. Haukereid, Tr. 17:5-11; Griego, Tr. 70:19-21. In Officer Chavez's own words, he "slammed A.G.'s face into the hood of [his] USFS vehicle two times." Ex. 6, p.4.

4. Griego could not lessen the impact in any way because he was handcuffed and off balance when Officer Chavez smashed his face down. Griego, Tr. 72:4-17. Officer Chavez used the force of his whole body to smash Griego down. Griego, Tr. 71:17-23.

5. Griego was stunned from the impact. His head was throbbing and he heard ringing. Griego, Tr. 72:18-21. Another camper, Sonia Jaramillo, heard the impact of Griego's head hitting metal from 10-15 feet away. Ex. 14, ¶ 11.

6. Officer Chavez admitted in his misdemeanor Plea Agreement, Ex. 6 (p. 4), that:

> When I slammed A.G. onto the hood, I knew it was wrong but I acted anyway, and I did so in my capacity as a law enforcement officer. A.G. was handcuffed and compliant, and he did not pose a threat at any time. By slamming A.G.'s head onto the hood of my vehicle in this manner, I willfully deprived him of his right under the United States Constitution to be free from unreasonable search and seizure – specifically, the right to be free from the use of unreasonable force by a law enforcement officer.

7. During the arrest, Griego asked Officer Chavez about the reason for his arrest. Officer Chavez repeatedly responded with profanity. Griego, Tr. 69:2-14. Specifically, during the assault, Griego asked Officer Chavez what he was doing this for, and he told Griego to "shut the fuck up." Griego, Tr. 76:17-22. Officer Chavez used profanity frequently throughout the encounter with Plaintiffs and the other campers as a means of intimidation. Ex. 15, ¶¶ 12, 16.

8. Despite the fact that Officer Chavez was required to provide true and correct information in his Plea, Ex. 6, p.3, para. 6, Officer Chavez omitted from his plea the fact that he slammed Griego's head into the metal part above the door on the passenger side of the Ranger vehicle two more times before shoving him in the vehicle. Griego, Tr. 75:17-76:16.

9. Officer Chavez detained Griego in the back seat of his police vehicle in handcuffs for approximately 2 to 3 hours. Griego, Tr. 81:12-17; Ex. 14, ¶ 15. During that time, Officer Chavez kept his trained police K-9 in the vehicle as well, and it constantly barked and lunged at Griego, threatening him and bouncing off of the Plexiglass partition. Ex. 15, para. 14; Griego, Tr. 78:6-79:9.

10. The temperature inside of the vehicle where Griego was confined was extremely hot. Griego, Tr. 77:3-78:8. It was around 80 degrees outside. Ex. 15, para. 7; Ex. 14, para. 15. The heat caused Greigo to become dizzy and agitated. Griego believed that it was 95 to 100 degrees inside the vehicle. Griego, Tr. 77:11-13, 19-22.

11. The heat and the dog's aggressive actions caused Griego to feel scared and nervous, like he was going to have a panic attack. Griego, Tr. 79:1-13.

12. When Griego saw Chavez's dog advance on Haukereid, and also based on Chavez's behavior, Griego feared not only for his own life, but for those of Haukereid and his other friends. Griego, Tr. 80:14-81:11.

13. Griego's hands and wrists were hurting and numb. He asked Officer Chavez to loosen his handcuffs at least twice. Officer Chavez refused and told Griego to "shut the fuck up." Griego, Tr. 81:18-25.

14. Officer Chavez refused to give Griego water when he was in custody in the back of his vehicle. Griego, Tr. 83:2-15. Greigo was so hot that his clothes were soaked and his body

began to stop producing sweat. Griego was concerned because he thought he might get heat stroke. *Id.* at 82:16-83:5, 77:19-24. Officer Chavez also refused to open the window despite Griego's two requests. Griego, Tr. 77:25-78:5.

15. When Chavez finally allowed Griego to get out of the vehicle, he was sweaty, flushed and red. Ex. 15, ¶ 14. He looked dehydrated. Ms. Jaramillo noticed that Griego's face was deep red, his hair was wet with sweat and his shirt was wet in the front. Ex. 14, para. 16.

16. Officer Chavez asked Griego about the military stickers on his truck and about his military service. He then told Griego, "[T]he Army would be fucking embarrassed and disgraced by you out here acting like an idiot." Griego, Tr. 89:20-90:4.

17. Officer Chavez commented after learning of Griego's wife's suicide, "That's a great way to be honoring the memory of your wife, is acting like a dumbass out here." Griego, Tr. 90:10-12.

18. These inquiries and comments by Officer Chavez were intended to harass, provoke and intimidate Griego and the other campers in the vicinity. Griego, however, exercised discipline and restraint, and did not respond. Griego, Tr. 90:6-17.

19. Officer Chavez threatened Griego and Haukereid by telling them, "If I ever see you guys on my fucking mountain, I'm going to arrest you." Griego, Tr. 83:16-24. Griego took the threat seriously and did not return to the mountain for several months after the assault. Griego, Tr. 85:24-86:5. The mountain was Griego's only coping mechanism to deal with his PTSD symptoms at the time of the assault. Griego's inability to return to the mountain for solace was greatly adverse to his mental health and wellbeing. Griego, Tr. 85:1-25; 66:3-67:7, Ex. 11.

## B. Chavez's Assault Of Elijah Haukereid

20. After battering Griego, Officer Chavez saw that Haukereid was recording him on a cell phone. Ex. 1, Cell Phone Video. Officer Chavez then aggressively confronted Haukereid, and slapped the phone out of his hand. Ex. 1; Haukereid, Tr. 19:18-20:4.

21. Officer Chavez then drew his Taser and pointed it at Haukereid. Haukereid, Tr. 20:13-21:2. Haukereid was frightened. Haukereid, Tr. 21:3-7. Officer Chavez ordered Haukereid to give him his identification and get down to the ground. Ex. 1.

22. Haukereid questioned Officer Chavez about why he needed to do that. Ex. 1. Officer Chavez then commanded his trained dog to come out of the vehicle and attack Haukereid. The dog advanced very close to Haukereid's face. Haukereid, Tr. 21:11-22:14; Ex. 15, para. 10.

23. Haukereid looked extremely scared, scared for his life. Ex. 15, para. 10; Ex. 14, para. 13.

24. Haukereid feared for his life and complied with Officer Chavez's commands to get on the ground. Ex. 14, para. 13; Ex. 15, para. 10; Haukereid, Tr. 22:11-12. At this moment, Haukereid was "absolutely terrified." He thought the officers could kill all of the campers in the woods, including him. Haukereid, Tr. 22:15-24.

25. Even though Haukereid did nothing wrong, he was handcuffed and detained in the back of Officer Olson's vehicle for about two hours. Haukereid was losing feeling in his shoulders and arms. Haukereid, Tr. 25:19-22, 26:5-21.

26. Officer Olson made Haukereid apologize to Officer Chavez before he would let Haukereid out of his vehicle. Haukereid, Tr. 27:8-15. Haukereid apologized to Officer Chavez, and Officer Chavez's responded to Haukereid by telling him to "go fuck himself." Haukereid,

Tr. 27:8 – 28:2. Officer Olson then placed Haukereid on the bumper of his vehicle. Haukereid, Tr. 26:5-9, 28:3-6.

27. Officer Chavez threatened Haukereid, saying that if he continued to ask about his phone, Chavez would take Haukereid to jail. Griego, Tr. 84:1-4.

**C.     Adam Griego's Compensatory Damages**

28. Griego suffered immediate physical injuries from the assault by Officer Chavez. His injuries included harm to his face, head, wrists and arms. *See* Ex. 5

29. At the time of the assault, Griego suffered from severe Post-Traumatic Stress Disorder (PTSD) and Traumatic Brain Injury (TBI) after having served in the United States Army from 2008 to 2013, where he suffered multiple injuries. Ex. 9B, p.1; Griego, Tr. 44:5-24. Griego enlisted in the Army when he was 19 years old. Griego, Tr. 44:9-10. He was discharged in August of 2013. Griego, Tr. 44:11-12.

30. Griego is a Gulf War Veteran, having served in combat in Iraq from 2009-2010 and Afghanistan from 2012-2013. Ex. 12B, pp. 913. Griego survived approximately five IED explosions while in combat, two of which resulted in serious trauma to his head. Ex. 12B, pp. 913-914; Griego, Tr. 45:4-9. On June 4, 2012, Griego earned a purple heart for his severe wounds from an IED explosion while serving in Afghanistan. Griego, Tr. 49:11-50:23.

31. The Albuquerque VA Regional Office, Department of Veterans Affairs, issued Griego's Rating Decision on April 10, 2014. Ex. 9B. The VA determined that Griego was one hundred percent (100%) disabled for PTSD and TBI, Ex. 9B, p. 1-3, thirty percent (30%) disabled for migraine headaches, Ex. 9B, p. 5, and ten percent (10%) disabled for tinnitus. Ex. 9B, p. 5. Griego also has two permanent scars on his face from bone fragments striking him during an IED explosion while in combat. Griego, Tr. 58:2-9.

32. Griego's PTSD and TBI with major depressive disorder are directly related to military service. The pre-discharge exam diagnosed co-occurring symptoms of irritability and insomnia between TBI and PTSD. The pre-discharge exam also diagnosed cognitive impairment due to TBI. The exam also recognized that Griego showed "Neurobehavioral symptoms of verbal and physical aggression, lack of motivation, empathy and cooperation, moodiness were reported." Ex. 9B, p.3.

33. The VA's Rating Decision states: "PTSD exam found that it is not possible to differentiate which portion of each symptom is attributable to [Griego's] PTSD and TBI, as they intersect, have common clinical features, influence one another and contribute to the veteran's decreased level of social and occupational functional and impairment. . . . Since the symptoms of TBI and PTSD overlap, they are evaluated as one disability. Ex. 9B, p. 3.

34. Griego's PTSD disability evaluation was based on the following: depressed mood; anxiety; forgetting directions; forgetting recent events; forgetting names; mild memory loss; impaired abstract thinking; chronic sleep impairment; panic attacks more than once a week; unprovoked irritability with period of violence; impaired impulse control; occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood; near-continuous panic affecting the ability to function independently, appropriately and effectively; and other symptoms. Ex. 9B, p. 4.

35. On the night of the assault, Griego told his mother, Donna Griego, about the assault. Mrs. Griego noticed that one of his pupils was distinctly larger than the other. She also noticed that he had a lisp when he was agitated and that he was stuttering. These symptoms lasted for several months after the assault before they started gradually decreasing. Griego, Tr. 92:11-93:20; Donna Griego ("DG"), Tr. 121:6-17.

36. Immediately after the assault, Griego's wrists were red, raw and swollen. DG, Tr. 121:1-5. Griego's pupils were also dilated and one was larger than the other. This was how Griego's eyes had looked after he was first discharged from the military. His mother wanted him to be seen by a medical provider because she researched this condition and found it could be related to TBI. DG, Tr. 114:22-115:9, 121:13, 16-22.

37. In addition to the injuries on his hand, wrists and head, Griego was extremely agitated and upset immediately after the assault. On a scale of 1 to 10, Griego was a 12 in his PTSD symptoms after the assault. DG, Tr. 118:23-119:3, 120:1-25.

38. Griego himself noticed symptoms similar to his TBI and that his PTSD worsened immediately after the assault by Officer Chavez. He began to experience more intense and more frequent migraines, which made him physically sick. Griego, Tr. 92:5-24. After the assault and battery, the migraines were more intense and painful. His nausea was also more amplified. These symptoms lasted for about a year after the assault. Griego, Tr. 98:22-99:12. Before the assault Griego's migraines typically lasted 24 hours. Currently, his migraines can last up to three days. Griego, Tr. 99:13-25.

39. Griego noticed his pupils were different sizes after the assault. Griego, Tr. 93:9-14. He also had difficulties in his speech, which included a lisp, stuttering and slurring his words. Griego, Tr. 93:1-20.

40. The assault by Officer Chavez caused Griego to have a distrust of law enforcement. Griego was adamantly against all law enforcement which caused his family to fear for his life in the event of an encounter with law enforcement. DG, Tr. 123:5-124:23. Griego's family was in crisis after the assault, which caused Griego's symptoms to intensify. DG, Tr. 124:24-125:2.

41. The distrust and anger toward law enforcement caused by the conduct of Officer Chavez was contrary to the respect for the police with which Griego was raised, and it derailed his aspirations of joining the Sheriff's Department. Griego, Tr. 68:18-24, 90:18-91:16.

42. Griego also experienced blurred vision and emotional issues, including heightened anxiety, depression and hypervigilance after the assault. He was missing school and work not only due to his anxiety and panic attacks, but also because of the increased migraines he was experiencing. Griego, Tr. 98:1-14.

43. Griego thought his mental state was going down a "rabbit hole" after the assault by Officer Chavez. Griego, Tr. 64:19-22.

44. Griego first reported the assault to his counselor, Catherine "Catine" Brown on July 2, 2014. Ex. 13A and 13B. Ms. Brown's entry on those dates indicates the following:

> Vet reports incident while camping that involved inappropriate use of force by Forest Service staff. Vet is extremely angry with news coming from Iraq, that makes him question the reason for the deaths of American soldiers, Vet became emotional and cried several times during the session. Vet "[s]tates he had been doing better up to the point of the incident, above, but has been having an even harder time in the past few weeks with the news reports. It seems that both of the above have increased the intensity of symptoms that had been abating." Vet is anticipating anniversary of death of combat brother. Vet requested assistance making an appt. with the TBI team, helped given while Vet in the office.

45. The assault by Officer Chavez increased Griego's TBI and PTSD symptoms that had been abating. Ms. Brown treated Griego for those symptoms and also helped him set up an appointment to have his TBI symptoms looked at by the Veterans Administration Medical Center (VAMC). Griego, Tr. 96:5-24.

46. Griego first reported the assault to VAMC providers on August 6, 2014. Ex. 12A and 12B. The VAMC medical records show the following, in pertinent part,

> 25yo male with with [sic] head trauma sustained on 5/16/14 [sic]….Two Forest Service agents handcuffed him for 6 hours and smashed his forehead against a car 4-5 times….Since then, he states that he has been having increased headaches, migraines, irritability, sleep issues, forgetfulness, and depression. Hx of TBI while in service, and he notes that, "This feels the same as when I had my TBI." Ex. 12B, p. 791. States that Maxalt works best for his migraines, which have become more frequent since head trauma on 5/16/14 [sic].

Ex. 12B, p. 791

47. On August 6, 2014, The VAMC medical team diagnosed Griego as follows:

> DIAGNOSIS: TBI and PTSD symptoms (headaches, migraines, irritability, sleep issues, forgetfulness), worsened by recent head trauma in May 2014.

Ex. 12B, p. 789.

48. Griego went in for treatment again on August 19, 2014. Ex. 12A and 12B, p.780-783. The VAMC medical records show the following, in pertinent part,

> [Patient] reports that he was recently in our ED for an event during which his head was banged on the hood of a car multiple times, and after that event he has had increased symptoms that are like after his TBI during military service. He also reports increased PTSD symptoms. [Vet] has frequent headaches, including migraine – about 4xweekly, some type of HA, and more migraines per month, 4-5 per month….endorses troubles sleeping, both w/falling & staying asleep, AND nightmares, increased depression, increased irritability. Assessment: PTSD, Depression with Irritability, Headache.

49. Griego's psychiatrist, Dr. Heather Wood of the Department of Veterans Affairs, began treating him in early 2015. Dr. Wood noted that Griego reported Officer Chavez's assault to her early in his treatment with her and that they discussed it several times. Ex. 11, para.1.

50. Dr. Wood recognized that Griego "suffered numerous kinds of damages from this incident. He had a history of a TBI and IED exposure in the combat zone, and to have his head repeatedly slammed into a vehicle was *highly deleterious*." Ex. 11, para. 4 (emphasis added).

51. Griego became overwhelmed and hit rock bottom after the assault. Griego, Tr. 94:15-95:10. At the time of the assault and battery, Griego was dealing with his wife's suicide, his discharge and treatment by the military. He expected Officer Chavez to follow the rules and he felt disgraced by his country and by Officer Chavez. *Id*. Griego's symptoms were amplified and it sent him down a road of not caring about his own health or life anymore. Griego, Tr. 95:1-10.

52. Griego received no restitution from Officer Chavez in the criminal case. No restitution was ordered despite Griego submitting a claim. Ex. 7, Judgment, Doc. 12, p.4.

**D. Elijah Haukereid's Compensatory Damages**

53. Haukereid was scared for his life when the law enforcement canine was sicced on him several times and when the Taser was drawn. Haukereid, Tr. 20:14-22:24.

54. Haukereid was in fear for his life and complied with Officer Chavez's commands to get on the ground. Ex. 14, para. 13; Ex. 15, para. 10. At that moment, Haukereid was "absolutely terrified." He thought the officers could kill all of the campers in the woods, including him. Haukereid, Tr. 22:15-24.

55. Even though Haukereid did nothing wrong, he was handcuffed and detained in the back of Officer Olson's vehicle for a couple of hours. He was losing feeling in his shoulders and arms. Haukereid, Tr. 25:21-22, 26:5-21.

56. Haukereid has an extreme fear of dogs to this day because of the assault. He cannot be around dogs due to his extreme fear. Haukereid, Tr. 40:5-16.

### E. Punitive Damages

57. Officer Chavez admitted that he willfully deprived Griego of his rights when he battered him without any justification. Ex. 6. Griego was not threatening him when Officer Chavez administered the repeated assaults. Ex. 6.

58. Officer Chavez and Officer Olson searched the vehicles and belongings of each of the eight campers with a search warrant or probable cause in disregard of their rights under the Fourth Amendment. Haukereid, Tr. 24:13-25:17; Ex. 14 ¶ 18; Ex. 15 ¶ 13.

59. Officer Chavez attempted to access and destroy Haukereid's cell phone in contravention of the United States Forest Service's duty to preserve evidence. Officer Chavez wrote Haukereid an inventory receipt and he was supposed to put the phone in evidence. Haukereid, Tr. 32:5-15.

60. Haukereid's cell phone tracking showed that it moved from the campsite to Los Lunas. Ex. 4C. Officer Chavez did not place the cell phone in evidence. He kept it with him. Ex. 4A-4J; Haukereid, Tr. 32:5-36:4. Haukereid's phone alerted him that Officer Chavez was trying to unlock his phone and access its contents, namely the video. Haukereid, Tr. 32:21-14. The reasonable inference from this is that Chavez was attempting to destroy the video evidence of his actions.

61. Plaintiffs and six other campers, including Sonia Jaramillo and Michael Pangburn, witnessed the conduct of Officer Chavez and Officer Olson. After assaulting Griego and Haukereid, Chavez threatened the other campers. He warned them that if anyone acted like Greigo and Haukereid, they would be arrested. Griego, Tr. 84:5-14.

62. Chavez and Olson illegally searched the vehicles and belongings, including intimate apparel, of all of the campers without their consent. Ex. 14, para. 18; Ex. 15, para.13.

63. Chavez and Olson gave numerous citations to all of the campers, including Plaintiffs. All of the citations were dismissed. Ex. 15, para. 15; Ex. 16, para. 19; Haukereid, Tr. 30:14-23; Griego, Tr. 84:16-23.

## LAW REGARDING FOURTH AMENDMENT

The Supreme Court has explained that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The degree of physical coercion that law enforcement officers may use is not unlimited, however, and "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id*. at 395. The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions. *Id*. at 396-97. The Fourth Amendment standard requires inquiry into the factual circumstances of every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest. *Id*. at 396. Furthermore, the Tenth Circuit has held that "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests—a person's sense of security and individual dignity." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1196 (10th Cir. 2001) (internal quotation omitted).

Under the Fourth Amendment, "[i]f a Plaintiff can prove that officers used greater force than would have been reasonably necessary to effectuate a lawful arrest, he is entitled to

damages resulting from that excessive force." *Cortez v. McCauley,* 478 F.3d 1108, 1127 (10th Cir. 2007). *"*[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures." *United States v. Gama–Bastidas,* 142 F.3d 1233, 1240 (10th Cir. 1998) (quoting *United States v. Perdue,* 8 F.3d 1455, 1462–63 (10th Cir. 1993)).

## LAW REGARDING DAMAGES

### A. Compensatory Damages

"[T]he Fourth Amendment operates as a limitation upon the exercise of federal power…It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 392 (1971) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946) (footnote omitted)).

As with a *Bivens* action, "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). To recover compensatory damages for mental and emotional distress, a plaintiff must prove that he has suffered a specific discernable injury with credible evidence. Evidence of mental anguish need not be corroborated by doctors, psychologists, or other witnesses, but a plaintiff must support his claims with competent evidence of the nature, extent, and duration of the harm. Fifth Circuit Civil Pattern Jury Instructions 10.12 (2014).

However, damages are to be measured without regard to the fact the plaintiff may have been unusually susceptible to injury or likely to have been harmed. Restatement (Second) of Torts § 461 (1965)("A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent."); UJI 13-1802 NMRA (2004) ("[T]he defendant is said to 'take the plaintiff as he finds [him or her],' meaning that the defendant, if liable, is responsible for all elements of damages caused by the defendant's conduct even if some of the plaintiff's injury arose because the plaintiff was unusually susceptible to being injured."). In New Mexico, damages for loss of enjoyment of life may be claimed in addition to and separate from the nonpecuniary damages for pain and suffering that the plaintiff must newly endure as the result of his or her injury. *See id.,* UJI 13-1807 NMRA; UJI 13-1807A NMRA.

**B.     Punitive Damages**

Punitive damages are "a particular remedial mechanism normally available in the federal courts," *Bivens*, 403 U.S. at 397, 91 S.Ct., at 2005, and are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights. *See also Patel v. Wooten*, 264 Fed. Appx. 755, 759 (10th Cir. Feb. 12, 2008) (unpublished) ("Punitive Damages may be awarded in a *Bivens* suit.") (internal quotation marks omitted). "Such damages for violation of federal law are to be awarded only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* (quoting *Youren v. Tintic Sch. Dist.,* 343 F.3d 1296, 1308 (10th Cir. 2003)) (internal quotation marks omitted).

In analyzing the constitutionality of a punitive damage award, the Court examines the factors articulated by the United States Supreme Court. *BMW of North America, Inc. v. Gore,*

517 U.S. 559, 574-75 (1996). Those factors are: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases. *Id.*

The degree of reprehensibility is "the most important indicium of the reasonableness of a punitive damage award." *Gore,* 517 U.S. at 575. In examining this factor, the Court considers a number of sub-factors, including whether the harm was physical or merely economic, whether the defendant acted with indifference to the health and safety of others, the financial vulnerability of the plaintiff, whether the conduct involved repeated actions or was an isolated incident, and whether the harm was the result of intentional action or mere accident. *Jones v. United Parcel Serv., Inc.,* 674 F.3d 1187, 1207 (10th Cir. 2012) (citing *State Farm Mut. Auto Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003)).

## **CONCLUSIONS OF LAW**

1. Chavez unlawfully arrested Griego and Haukereid in violation of the Fourth Amendment to the United States Constitution.

2. The crimes for which Chavez arrested Griego and Haukereid were not violent or serious crimes. Chavez and Griego, being unarmed and non-violent, posed very little threat to the safety of Chavez and Olson. Further, Griego and Haukereid made no attempts to resist or evade arrest. Despite this, Chavez used a high level of force in arresting Griego by violently slamming Griego's head into his Forest Service vehicle four times, confining him in a hot car with no water for several hours, and terrorizing him with a violent police dog. Chavez used a high level of force in arresting Haukereid by slapping Haukereid's phone out of Haukereid's hand, drawing

his taser and pointing it at Haukereid, confining Haukereid in Olson's police vehicle for a couple of hours, and terrorizing Haukereid with his police dog. These acts are objectively unreasonable under the circumstances.

3. In light of the foregoing, under *Graham v. Connor*, 490 U.S. 386, 396 (1989), the force used by Defendant David Chavez to arrest Griego and Haukereid was excessive under the circumstances and therefore violated their rights under the Fourth Amendment.

4. Chavez's use of excessive force was intentional.

5. The excessive force used by Chavez caused physical, mental, and emotional injuries to Griego, including:

    (a) bruises and lacerations to Griego's face, head, wrists and arms;

    (b) physical pain and mental suffering caused by being confined in a hot car for several hours with no water, while in fear of an aggressive, violent police dog in the same vehicle;

    (c) significant aggravation of physical and emotional symptoms stemming from Griego's preexisting PTSD and TBI, including:

        (1) an increase in the frequency, duration, and severity of Griego's headaches;

        (2) speech impairment, including a stutter and a lisp;

        (3) blurred vision;

        (4) anger and distrust toward all law enforcement, including family members;

        (5) heightened anxiety, depression, irritability, insomnia, panic attacks, and hypervigilance;

6. The excessive force used by Chavez caused injuries to Haukereid, including:

(a) Haukereid feared that he or his friends would be killed either by Chavez or by Chavez's police dog;

(b) while being handcuffed in the back of a police vehicle for two hours, Haukereid's shoulders and arms went numb;

(c) Haukereid has an ongoing, crippling fear of dogs, such that he can no longer be around dogs.

7. Plaintiffs Griego and Haukereid have proven the foregoing by a preponderance of the evidence, and therefore they are entitled to compensatory damages for the physical injury, pain and suffering, and mental anguish they suffered as a result of Defendant David Chavez's wrongful conduct. *See* Fifth Circuit Pattern Jury Instructions (Civil Cases) 15.2 (2014).

8. Plaintiffs Griego and Haukereid have proven by a preponderance of the evidence that Griego's conduct was motivated by evil motive or intent, and that his conduct involved reckless or callous indifference to their federally protected rights. The Court bases this conclusion on the egregiousness of Chavez's behavior, the fact that he caused Plaintiffs physical harm, the fact that Chavez acted with indifference to the health and safety of the Plaintiffs, the fact that the harm was the result of Chavez's intentional actions, and the fact that he attempted to destroy the video evidence of those actions.

## **DAMAGES AWARD**

In light of all the foregoing evidence, the Court concludes that Griego is entitled to compensatory damages in the amount of $150,000.00 and punitive damages in the amount of $300,000.00.

Haukereid is entitled to compensatory damages in the amount of $40,000.00 and punitive damages in the amount of $100,000.

The Court will enter a separate Judgment setting forth these damages.

                                                        *[signature]*
**UNITED STATES DISTRICT JUDGE**